WILLIAM T. GALT AND OTHERS, APPELLANTS *vs.* JAMES GALLO-
WAY, JUN. AND OTHERS, APPELLEES.

The possession of a warrant has always been considered at the land office in
Ohio sufficient authority to make locations under it. Letters of attorney
were seldom, if ever, given to locators; because they were deemed unneces-
sary. [339]

An entry could only be made in the name of the person to whom the warrant
was issued or assigned; so that the locator could acquire no title in his own
name, except by a regular assignment. [339]

When an entry is surveyed, its boundaries are designated, and nothing can be
more reasonable and just than that these shall limit the claim of the locator.
To permit him to vary his lines, so as to affect injuriously the rights of others
subsequently acquired, would be manifestly in opposition to every principle
of justice. [340]

Since locations were made in the Virginia military district in Ohio, it has been
the practice of locators, at pleasure, to withdraw their warrants, both before
and after surveys were executed. This practice is shown by the records of
the land office, and is known to all who are conversant with these titles.

The withdrawal is always entered on the margin of the original entry, as a notice
to subsequent locators; and no reason is necessary to be alleged as a justifica-
tion of the act. If the first entry be defective in its calls, or if a more ad-
vantageous location can be made, the entry is generally withdrawn. This
change cannot be made to the injury of the rights of others; and the public
interest is not affected by it. The land from which the warrant is withdrawn
is left vacant for subsequent locators; and the warrant is laid elsewhere, on
the same number of unimproved lands. [341]

As the records of the land office are of great importance to the country, and are
kept under the official sanction of the government; their contents must always
be considered, and they are always received in courts of justice as evidence
of the facts stated. [342]

Under the peculiar system of the Virginia land law, as it has been settled in Ken-
tucky, and in the Virginia military district in Ohio, by usages adapted to the
circumstances of the country, many principles have been established which are
unknown to the common law. A long course of adjudications has fixed these
principles, and they are considered as the settled rules by which these military
titles are to be governed. [343]

An entry, or the withdrawal of an entry, is in fact made by the principal sur-
veyor at the instance of the person who controls the warrant. It is not to be
presumed that this officer would place upon his records any statement which
affected the rights of others, at the instance of an individual who had no
authority to act in the case. The facts, therefore, proved by the records, must
be received as prima facie evidence of the right of the person at whose in-
stance they were recorded; and as conclusive, in regard to such things as the
law requires to be recorded. [343]

[Galt and others *vs.* Galloway and others.]

No principle is better settled, than that the powers of an agent cease on the death of his principal. [344]

A location made in the name of a deceased person is void; as every other act done in the name of a deceased person must be considered. [345]

The withdrawal of an entry is liable to objection, subject to the rights which others may have acquired subsequent to its withdrawal having been entered in the land office. This is required by principles of justice as well as of law. [347]

APPEAL from the circuit court of Ohio.

James Galt, as heir to his brother Patrick Galt, the ancestor of the complainants, on the 6th day of August 1787, made an entry for military lands in the Virginia reservation, in the following words : "No. 610, James Galt (heir) enters one thousand acres on part of a military warrant, No. 194, on the Miami river, beginning at the upper corner of Francis Wheeling's entry, No. 438, running up the river five hundred poles when reduced to a straight line; thence at right angles with the general course of the river, and with Wheeling's line for quantity."

The bill of the appellants stated that this entry was valid on the 15th of November 1796, and that a survey under the same was made thereon agreeably to its calls; that James Galt died intestate prior to the 2d of March 1807; and that posterior thereto Elias Langham, without any authority from James Galt or from the complainants, caused an entry of the withdrawal of four hundred acres to be made in the books of the surveyor; the effect of which was to render the residue of the entry of such a shape as that it could not be legally surveyed, the law requiring that the breadth of a survey shall be one-third of its length. Subsequent to this withdrawal, the four hundred acres which Langham attempted to have left vacant thereby, were located by Galloway, by entries of three hundred acres in his own name, and one hundred acres in that of Ladd, both of which were included in one survey made on the 18th of June 1808; but afterwards, on the 20th of July 1809, Galloway having caused the word "error" to be entered on the face of the plats of the survey of 1808, had separate surveys executed in his own name and in that of Ladd, and also caused a survey to be made for himself of six hundred acres of James Galt's entry of August 1787 of

one thousand acres, the part of the same, to withdraw which no attempt had been made by Elias Langham. A patent for the four hundred acres was obtained by Galloway; and he afterwards conveyed the land included in the same to different persons, who are made parties to the bill. The bill also stated that Thomas Baker resides on part of the one thousand acres, claiming title under Joshua Collet. That Collet claims title to part; that William Patterson is in possession of, claiming title to the residue; and that Galloway refuses to withdraw the four hundred acres. The complainants say they cannot procure a patent for the six hundred acres, without jeopardizing their title not only to the four hundred acres, but also to the six hundred acres; and pray for particular and general relief.

The answer of James Galloway, Jun. states, that Langham withdrew the four hundred acres of Galt's entry of one thousand acres; and that he believes the withdrawal was authorised, but knows not by whom; and, that since the bill was filed, he has heard the same was authorised by Westfall. The survey on the six hundred acres, the residue of Galt's entry, he says, he executed and returned, and that he was at the time he made the same, a regular deputy under Anderson. He obtained a patent for three hundred acres of the land included in the patent, and sold the same.

Joshua Collet and William Patterson, in their answers, claim to hold title under Westfall; the same having been sold as his property for his debts or responsibilities. Patterson represents, that he believes Westfall made a contract with Galt for the whole of warrant No. 194, on a part of which his claim is founded; and that Westfall obtained patents in his own name for other entries on the warrant, and sold them for his own benefit.

Elias Langham answers, that, at the request of Westfall, he withdrew the four hundred acres as charged. He believed Westfall purchased the warrant No. 194 from Galt, in his life time. He considered himself in possession of the whole, as agent of Westfall, except one thousand acres transferred to Mallow from 1797; and never heard of complainants' claim

[Galt and others vs. Galloway and others.]

until after the death of Westfall. By order of Westfall, he laid off the town of Westfall in Pickaway county, and sold several small tracts of land, part of warrant No. 194; and that he contracted with Westfall to withdraw and re-enter other lands, which entitled him to six hundred acres.

Evidence was exhibited, intended to show that an impression prevailed generally that Westfall was entitled to half of Galt's military land warrant. That Galt's warrant was put into Westfall's hands to locate land. The opinion of the court states such parts of the testimony and other facts of the case, as were considered made out by proof.

The circuit court of Ohio gave a decree against the complainants, and they appealed to this court.

The cause was argued by Mr Irvin for the appellants, and by Mr Doddridge, contra.

For the appellants, it was contended:

1. That the entry in question of one thousand acres, was originally good and valid.

2. That the original survey of one thousand acres, included the lands embraced in said entry.

3. That James Galt, in whose name the said entry and survey were made, died intestate; and that the appellants are his heirs at law.

4. That on the death of said Galt, a right to three thousand acres, part of warrant No. 194, and of the lands appropriated thereby, (which includes the lands in question,) vested in the appellants as his heirs at law.

5. That their right to the lands in question is not destroyed by either:

1st. Langham's attempt to withdraw four hundred acres, part thereof; or 2d. The locations made in the name of Galloway and Ladd, on the part of said entry, so attempted to be withdrawn, and the surveys and patents on said entries; or 3d. The conveyances from Galloway to Stephenson, and the Gibsons, and from Ladd's executor to Wilson; or 4th. The conveyance bond executed by Westfall to Armstrong, and assigned by him to Davis, and by Davis to Patterson; or

5th. The proceedings in attachment against Westfall, and the sale and conveyance to Collet.

Mr Irvin argued: that there was no legal evidence to show that any authority had been given by Galt, the ancestor of the appellants, to any one, to withdraw his entry. The declarations of Westfall, that he had received such authority, were not evidence that it had been given; and the declarations of an agent cannot be used against his principal, unless within the scope and purpose of his authority. A power to locate the entries, did not authorise their revocation; nor did it give to the agent the right to dispose of the property or make it his own. If any power was given by James Galt to Westfall or to any other person, it should be shown. He who asserts it, must make it out by evidence. If the contents of the instrument, which is said to have given the power, are to be proved by parol evidence, its non-production should be accounted for. Cited, 8 East, 550. 7 Wheat. 154. Phil. 77, 79. 2 Taunt. 21.

The removal of the warrant and entry was thus without authority. Langham acted under Westfall; and Westfall had no authority to give to Langham, to do what was done by him. The whole of the proceedings of Langham were therefore void; and no titles obtained under them can be valid against those whose legal and known rights were infringed by the fraudulent contract of pretended agents.

After the survey was made, the warrants became functi officio: the warrant merges in the survey, if the survey was authorised; but not otherwise. 1 Ohio Rep. 225. 3 Marsh. Ken. Rep. 501, 96. 1 Marsh. 129, 144. Hardin, 567.

Can the defendants avail themselves of want of notice? The assignee of an equity is in no better condition than the assignor, and there is no proof in the case that Westfall owned an acre of the land. Cited 6 Wheat. 560. 1 Marsh. 144.

Mr Doddridge, for the defendants, contended,

1. That upon the whole case, the complainants have shown no title in themselves.

[Galt and others *vs.* Galloway and others.]

2. As to Galloway and those claiming under him, that the four hundred acres being actually withdrawn on the surveyor's books, vacated that quantity of the original entry: that they were not bound to look beyond the record; and are innocent purchasers, without notice.

3. That owing to the particular position of the one thousand acre entry, the withdrawal of four hundred acres necessarily left vacant the part located by Galloway.

The appellants have slept too long on their rights, if any existed. The bill was filed in 1821, and they have suffered too long a period to elapse without complaint, on their part, of those proceedings which are now claimed to be void. Under those proceedings sales had been made; bona fide titles for a full and valuable consideration had been acquired by the defendants; all of which are to be vacated and defeated, if the claims of the appellants prevail. He contended; that as to the four hundred acres, the conduct of the surveyor, in withdrawing this part of the survey, was in accordance with a practice of universal prevalence; nor was it required by the law of Virginia that, to transfer a warrant, a regular assignment of it should be made. This principle was recognized by this court, in the case of Bouldin and Wife *vs.* Massie's Heirs et al. 7 Wheat. 122. It may, therefore, be well presumed, that the acts of Westfall were authorised; that he had an interest in the warrants; and, therefore, what was done by Langham was correct. When an entry is made on the books of the office, by the principal surveyor, it must be supposed valid; especially at a great distance of time; unless the contrary be plainly proved:

The land law of Virginia, which regulates this case, does not support the position, that a warrant surrendered is functus officio. 7 Wheat. 23. Vir. Laws, 326, sec. 19, 24, 32, 42, 38.

Mr Justice M'LEAN delivered the opinion of the Court:

This suit is brought to this court, by an appeal from the circuit court of the district of Ohio.

The complainants claimed through their ancestor, James Galt, one thousand acres of land, under a military warrant

[Galt and others *vs.* Galloway and others.]

obtained by him, as heir to his brother, Patrick Galt. The entry was made on the 6th of August 1787, as follows: "No. 610, James Galt, heir, enters one thousand acres on part of a military warrant, No. 194, on the Miami river: beginning at the upper corner of Francis Whiting's entry, No. 438, running up the river five hundred poles, when reduced to a straight line; thence at right angles with the general course of the river, and with Whiting's line for quantity."

On the 15th of November 1796, the entry was surveyed agreeably to its calls, and the survey was recorded on the 31st of May 1798. James Galt died intestate in 1800. In 1805, Elias Langham, under the authority, as he alleges in his answer, of Westfall, who made the original entry, withdrew four hundred acres of the warrant, on this entry, and located the same number of acres at another place, in the name of James Galt, heir, &c.

The four hundred acres left vacant by this withdrawal, were located by James Galloway, Jun.; three hundred acres of which were entered in his own name, and one hundred acres in the name of J. Ladd. These entries were surveyed on the 20th of July 1809, after Galloway had caused to be made a survey of the six hundred acres, which remained of the entry in the name of Galt. A patent was issued on the entries and surveys of Galloway, and he has conveyed to four of the defendants, each, one hundred acres. Thomas Baker and William Patterson are in possession of, and claim title to the six hundred acres in the name of Galt. Baker's claim originated by a sale under an attachment against Westfall; and Patterson's by a purchase from him: but he does not appear, from the facts in the case, to have had any interest in the land.

There is no evidence that Galloway had any agency in the withdrawal of a part of the entry, as stated by Langham. The complainants allege, that the withdrawal of the four hundred acres will invalidate the residue of the entry; as a survey, agreeably to its calls, will give the six hundred acres an illegal form. They pray for such general and particular relief, as the nature and circumstances of their case may require.

[Galt and others *vs.* Galloway and others.]

It is contended by the defendants' counsel, that no relief can be given against the defendants, who claim title to the six hundred acres; as by the facts stated in the bill, it clearly appears, they have no title either equitable or legal. That the sale under the attachment could convey no title to Collet, as Westfall had no claim whatever to the land; and that Baker and Patterson, who are now in possession, must be considered as trespassers. These occupants can be considered in no other light by the court than intruders; and the remedy against them is at law, and not in chancery. No decree could be made against them, unless it be, that they should deliver possession of the premises; and to obtain this, the action of ejectment is the appropriate remedy.

Jurisdiction of this branch of the cause cannot be taken as an incident to the other, for it does not appear that the withdrawal of the four hundred acres will destroy the entry for the residue; and if it did, it would only be necessary to relieve against the defendants who held the legal title, to restore to the complainants the means of perfecting their title to the six hundred acres.

It appears, that a land warrant, numbered one hundred and ninety-four, for six thousand acres, was issued to James Galt, heir at law and legal representative of Patrick Galt, deceased. That this warrant was placed in the hands of Westfall, who located it on various tracts of land, including the tract in controversy.

In 1798, three thousand acres of this warrant were assigned by Galt to Westfall. The assignment was made on three surveys, which had been executed under these entries; one of these surveys was assigned by Westfall to Adam and Henry Mallow, and on all of them patents have been issued.

The possession of the warrant by Westfall is the only evidence of his right to make the locations; and this has been uniformly considered, at the land office. as a sufficient authority. Letters of attorney were seldom, if ever, given to locators; because they were deemed unnecessary.

The entry could only be made in the name of the person to whom the warrant was issued or assigned; so that the

locator could acquire no title in his own name, except by a regular assignment.

The power of Westfall to make the location is not contested; but the validity of the withdrawal is denied by the complainants, on two grounds :

1. That the warrant had become merged in the survey, and could not be withdrawn.

2. That Langham had no power to withdraw it.

Several authorities have been referred to in support of the first position. Much reliance is placed on the decision in the case of Estill and others *vs.* Hart's Heirs, reported in in Hardin, 567. In their opinion the court in that case say, that, "whatever doubts might be raised as to the particular time at which the warrant shall be said to be merged in the survey; whether from the time it is approved by the chief surveyor and recorded, or from the time it was delivered out to the owner; or from the end of three months after making the survey ; we conceive the case clear, that, after registering, the warrant was no longer an authority to any surveyor to receive an entry or make another survey."

The right of withdrawing a warrant, after a survey had been executed, was not involved in this case.

Two entries were made by Hart; one in 1780, the other in 1782; and both were surveyed in 1784. Boon subsequently entered land adjoining these surveys. Some years after this was done, Hart's executor and one of his heirs caused another survey to be made of the entries of his ancestor, which, varying from the former surveys, covered a part of Boon's land. The court decided, and very properly, that the second survey was void. When an entry is surveyed, its boundaries are designated, and nothing can be more reasonable and just than that these shall limit the claim of the locator. To permit him to vary his lines so as to affect injuriously the rights of others subsequently acquired, would be manifestly in opposition to every principle of justice.

In the case of Loftus and others *vs.* Mitchel, 3 Marsh. 598, it is laid down by the court, that a survey made by a person without the authority of the owner of the entry, does

not merge the warrant. The same principle is recognized in the case of Galloway's Heirs *vs.* Webb, 1 Marsh. 130. In the case of Taylor *vs.* Alexander, 3 Marsh. 501, the court decided that a second survey of the same entry was void.

It will be perceived, that none of the authorities cited sustain the position that a warrant cannot be withdrawn after the survey has been executed and recorded. If the warrant merge in the entry, and the entry in the survey, as laid down in some adjudications; and if the warrant, being once merged, is beyond the control of the owner; an entry, equally with a survey, would prevent a withdrawal of the warrant.

Since locations were made in the Virginia military district in Ohio, it has been the practice of locators, at pleasure, to withdraw their warrants, both before and after surveys were executed. This practice is shown by the records of the land office, and is known to all who are conversant with these titles.

The withdrawal is always entered on the margin of the original entry, as a notice to subsequent locators; and no reason is necessary to be alleged, as a justification of the act. If the first entry be defective in its calls, or if a more advantageous location can be made, the entry is generally withdrawn.

This change cannot be made to the injury of the rights of others, and the public interest is not affected by it. The land, from which the warrant is withdrawn, is left vacant for subsequent locators; and the warrant is laid elsewhere, on the same number of acres of unappropriated land.

In the case of Taylor's Lessee *vs.* Myers, reported in 7 Wheat. 23, one of the questions considered and settled, was, "can the owner of a survey, made in conformity with his entry, and not interfering with any other person's right, abandon his survey after it has been recorded?" The chief justice, who delivered the opinion of the court, says; "it seems to be an ingredient in the character of property, that a person who has made some advances towards acquiring it, may relinquish it; provided the rights of others be not affected by such relinquishment. This general principle

derives great strength from the usage which has prevailed among these military surveys. The case states, that it has been customary, ever since the year 1799, to withdraw surveys after they have been recorded. The place surveyed has, of course, been considered as having become vacant; and has been appropriated by other warrants, which have been surveyed and carried into grant."

In that case the court did not decide, because it was unnecessary to do so, that the warrant thus withdrawn could again be located; but this would follow as a matter of course. If the withdrawal leave vacant the land entered, the warrant remains unsatisfied, and may be again located on any other unappropriated land.

It appears, therefore, that the right of the owner to withdraw his warrant, after the survey has been executed and recorded, is clear, both on principle and authority.

The power of Langham to make the withdrawal, is the next point to be considered.

Possession of the warrant, as has been shown, is a sufficient authority to make the location, and it will not be questioned, that the locator may amend his entry, by changing its calls. If he may do this, he may withdraw it, and make a new location. The control which he must necessarily exercise over the warrant, cannot, consistently with the interest of the owner, be limited to the first attempt at making an entry. If that attempt be imperfect, or if the selection of the land be less advantageous to his employer than it might be, there is no reason why he should not change the entry. The authority necessarily extends to the withdrawal, as fully as to the location, and such has been the uniform construction of the power of the locator. Confidence is reposed in his knowledge and discretion, and he has only to act in good faith to bind his principal.

The register of the land office keeps a record of all entries and surveys; and on his official certificates patents are issued by the government. His records are always under his control; and all entries made in them are made by himself, or by a person authorised to act for him.

As the records of this office are of great importance to the

country, and are kept under the official sanctions of the government, their contents must always be considered, and they are always received in courts of justice as evidence of the facts stated.

If a different rule were now to be established, and every act of the locator, in making an entry or withdrawing it, must be shown to have been done under a formal letter of attorney, it would destroy, in all probability, a majority of the titles not carried into grant.

Under the peculiar system of the Virginia land law, modified as it has been in Kentucky, and in the Virginia military district in Ohio, by usages adapted to the circumstances of the country, many principles have become established which are unknown to the common law. A long course of adjudications has fixed these principles, and they are considered as the settled rules by which these military titles are to be governed.

An entry, or the withdrawal of an entry, is in fact made by the principal surveyor, at the instance of the person who controls the warrant. It is not to be presumed, that this officer would place upon his records any statement which affected the rights of others, at the instance of an individual who had no authority to act in the case. The facts, therefore, proved by these records, must be received as prima-facie evidence of the right of the person at whose instance they were recorded, and as conclusive in regard to such things as the law requires to be recorded.

It will be in the power of an individual to rebut this presumption of authority in a person whose acts have been injurious to him and were unauthorised, by an exhibition of facts and circumstances.

In the case of Moore and others *vs.* Dodd and others, reported in 1 Marsh. 140, the withdrawal of an entry by administrators was declared to be void; as the right had descended to the heir, and the administrators had no control over it. That the withdrawal in that case was made at the instance of the administrators, appeared from the entry on the record.

Langham, in his answer, states, that he made the withdrawal of the four hundred acres, by the authority of West-

fall. This withdrawal was made eighteen years after the date of the entry, and nine years after the survey was executed. So great a lapse of time from the entry to the withdrawal, is a circumstance which must be considered as shaking the right of the locator; which depends, alone, upon his having located the warrant. In this case, there is no positive evidence that Westfall, after the entry, exercised any agency over the land, in the payment of taxes, or in any other manner, until this withdrawal took place on the application of Langham.

The survey which was executed by O'Connor in 1796, does not appear to have been done at the instance of Westfall; though, from his having made the entry, he may be presumed to have directed the survey.

From the answer of Patterson it appears that Westfall sold the three hundred acres claimed by him to one Davis, in the year 1806, and gave a bond with security for a title. It is now apparent that he had no claim to any part of the land in controversy. The right to the warrant for six thousand acres, by assignments on the surveys for three thousand acres, which seems to have been urged in the court below, is abandoned by the counsel in the argument here; and the power to withdraw the four hundred acres is rested on the first location of the warrant.

In the absence of any proof of right, the sale of a part of this tract by Westfall is an evidence of bad faith on his part; and tends to throw suspicion over the act of withdrawal. It is a well settled principle, that the locator, as such, has no right to sell the land.

It is in proof, that James Galt, to whom the warrant issued, and in whose name the locations under it were made, died in 1800. The withdrawal was made in 1805; and the question is presented, whether the decease of the owner of the warrant puts an end to the power of the locator.

No principle is better settled, than that the powers of an agent cease on the death of his principal. If an act of agency be done, subsequent to the decease of the principal, though his death be unknown to the agent, the act is void.

On the death of James Galt, the land in controversy de-

[Galt and others *vs.* Galloway and others.]

scended to his heirs; and there is no proof that they authorised Westfall to act in their behalf.. If he had the power to withdraw any part of the warrant, it must have been derived from the single circumstance of his having had the control of the warrant when the entry was made.

Under ordinary circumstances, this power, as has been shown, would be sufficient. But it is a power which may be revoked or terminated by circumstances. The possession of the warrant is tantamount to a letter of attorney to make the entry, to alter or withdraw it, and to direct the survey: but is there no limitation when this authority under the warrant shall cease? Can it be safely considered as investing the locator with a higher power than a letter of attorney?

If the authority be in the nature of a power of attorney, and subject to the same principles of law, it ceased on the death of Galt. On that event, new interests sprung up which could not be controlled by the agent of the deceased. In the case of Hansford *vs.* Minor's Heirs, reported in 4 Bibb, 385, the court decided; that, "after the death of Minor, as the law then stood, it was clearly irregular to survey the entry and obtain the grant in his name: but as he at that time had a devisable interest in the land, upon his decease that interest passed to Nicholas, the father of the appellees, and consequently the title ought regularly to have been perfected in his name."

By a statute of Kentucky, passed in 1792, lands granted to deceased persons descended to their heirs or devisees. This statute is not in force in Ohio, so as to give validity to the location in the name of James Galt of the four hundred acres withdrawn by Langham. This location having been made in the name of a deceased person, is believed to be void; as every other act done in the name of a deceased person must be considered.

An entry made in the name of a dead man is a nullity; as appears from the decision in the case of M'Cracken's Heirs *vs.* Beall and Bowman, reported in 3 Marsh. 210: but such an entry in Kentucky, under the statute of 1792, enures to the benefit of the heirs of the deceased.

There is no pretence that the withdrawal was made under

Vol. IV.—2 T

any authority from the heirs of Galt; such a presumption would be rebutted by the subsequent location of the four hundred acres, in the name of the deceased. An attempt has been made to show that the heirs of James Galt claim all the lands in Ohio entered in his name; and among other tracts, the four hundred acres located by the withdrawn warrant. But no other proof of the fact has been adduced, except the vague declarations of David Collens, an alleged agent of William T. Galt, who acted for the other heirs; and these are not evidence. If the heirs had sanctioned the withdrawal, by claiming the new location, it would render the act valid: and if such evidence be in the power of the defendants, it should have been produced.

As the heirs are residents of another state, the lapse of time does not raise a very strong presumption against them.

No doubt can exist that Langham, in making the withdrawal, acted without authority; and the question is presented, whether an act thus done shall bind the owners of the entry.

There is much plausibility and force in the argument, that the entry of a withdrawal on the record, being notice to subsequent locators, must be held valid, though done without authority, in favour of rights subsequently acquired, without notice of the improper withdrawal.

The law requires the principal surveyor to record entries and surveys; these, and any other matters which the law requires to be recorded, must be received as conclusive of the facts; and parol evidence cannot be received to invalidate them, unless fraud be shown. But the law does not require the withdrawal of an entry to be recorded. This is an act of the party, rendered essentially necessary to the regularity of entries; but it cannot be considered of as high validity as the record of an entry or survey.

It operates as a notice to subsequent locators, and must be received as prima facia evidence of the right of the person who caused the withdrawal to be made. But unless the law had required the principal surveyor to judge of the authority by which the warrant is withdrawn, and to make

the withdrawal on his record, can it be considered as conclusive?

The principal surveyor may enter a withdrawal, as was done in the case under consideration, at the instance of an individual who has not the shadow of authority. If entries and surveys may be destroyed in this manner, they must be considered of little value. On the other hand, if the authority of the person who withdraws the warrant may be contested under any circumstances; entries subsequently made may be annulled.

In the latter case, however, it is always in the power of the locator, when he is about to enter a tract from which a warrant has been withdrawn, to ascertain at whose instance the withdrawal was made; and this fact will enable him to investigate the authority under which the act was done. If the withdrawal was made by the owner of the warrant or the person who located it, the authority would be unquestionable. In the latter case, a great lapse of time might create doubts whether the power of the locator had not terminated, and this would lead to particular inquiry.

If it appeared that the warrant had been withdrawn by a stranger, should not that circumstance put the subsequent locator on strict inquiry? He has the means of guarding his interests by reasonable diligence; and this the law always imposes.

But the owner of the original entry, if it may be withdrawn without authority, has no means by which his interests can be protected. The principal surveyor is not under his control; nor, by the usages of the office, is he answerable to him for damages. It seems, therefore, that the principles of justice, as well as of law, require the act of withdrawal to be liable to objection, within the limits above prescribed.

As the withdrawal in this case was without authority, it was a void act; and consequently no right was acquired by the subsequent location.

The decree of the circuit court must be affirmed, so far as relief is denied against Baker and Patterson, who are in possession of the six hundred acres; and reversed, as to the

other defendants; and the cause is remanded to the circuit court, with instructions to decree, that William Wilson, Andrew Gibson, Matthew Gibson, and William Stephenson, do, on or before the first day of November next, execute to the complainants, jointly or severally, a release of their interest in the premises; provided before that time they shall have been paid for their improvements, under the statute of Ohio. And the circuit court is hereby directed to proceed to ascertain the value of such improvements, agreeably to the above statute; each party to pay his own costs in this court.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Ohio, and was argued by counsel; on consideration whereof, it is ordered, adjudged and decreed by this court, that the decree of the said circuit court in this cause be, and the same is hereby affirmed, so far as relief is denied by the said court against Baker and Patterson, who are in possession of the six hundred acres of land; and that the said decree of the said circuit court in this cause be, and the same is hereby reversed as to the other defendants. And it is further ordered by this court, that this cause be, and the same is hereby remanded to the said circuit court, with instructions to decree, that William Wilson, Andrew Gibson, Matthew Gibson, and William Stephenson, do, on or before the first day of November of the year of our lord eighteen hundred and thirty, execute to the complainants, jointly or severally, a release of their interest in the premises; provided, that before that time they shall have been paid for their improvements, under the statute of Ohio. And that the said circuit court be, and the same is hereby directed to proceed to ascertain the value of such improvements, agreeably to the above statute. And that the said court do and act further in the premises as to law and justice may appertain. And it is further ordered by this court, that each party respectively in this court pay his own costs accruing in this court.