## LESSEE OF CADWALLADER WALLACE *v.* NATHANIEL SAUNDERS.

An entry and survey in the name of A. Singleton, attorney in fact for C. Holmer, deceased, are both void, and can not be the foundation of a subsisting title.

RESERVED in Highland county. This case was submitted to the court upon the following agreed statement of fact:   ·

It was agreed that the plaintiff's claim to the premises in question is based upon an entry for twenty-two hundred and fifty acres of land on Lee's creek, a branch of Rattlesnake fork of Paint creek, made on April 20, 1795, which entry is as follows:

"No. 2,519. Anthony Singleton, attorney in fact for Christian Holmer, deceased, enters twenty-two hundred and fifty acres of land, part of a military warrant, No. 2,744, on Lee's creek, a branch of the Rattlesnake fork of Paint creek, beginning at the west

corner of Hardin and Gray's survey, No. 1,836, thence 39 west 616 poles, thence south 73 west 514 poles, thence south 17 east 574 poles, thence north 73 east to the beginning."

This entry was surveyed by Nathaniel Massie, deputy surveyor, on April 30, 1795, purporting to be "surveyed for Anthony Singleton, attorney in fact for Christian Holmer, deceased," and the plat and certificate of survey returned and recorded in the office of Richard C. Anderson, principal surveyor, on May 15, 1795.

Said entry and survey was patented to Cadwallader Wallace by patent bearing date May 28, 1834, which patent is made a part of the agreed case. The granting part of the patent is as follows: "In consideration of military service performed by Christian Holmer, who was a major for three years to the United States in the Virginia line and continental establishment, and in pursuance of an act of Congress," etc., "there is granted by the United States to Cadwallader Wallace, assignee of John D. Munford, attorney in fact to Lucy H. Taylor, formerly Lucy H. Singleton, and Richard Singleton, the only children and heirs at law of Anthony Singleton, deceased, a certain tract of land," etc., describing in part the land in controversy.

*It was further agreed that the defendant's claim is based [174 on an entry made on September 14, 1818, of which the following is a copy:

"No. 9,669. Thomas M. Saunders and John W. Pope, assignees, enter four hundred acres of land on a part of a military warrant, No. 5,349, on Lee's creek, a branch of the Rattlesnake fork of Paint creek, beginning at a hickory, sycamore, and sugar tree, northeasterly corner to Richard C. Anderson's survey, No. 3,759, thence north 36¼ east 359 poles to the line of Levi Teagle's survey, No. 2,298; thence south 25½ east, and from the beginning south 25½ east with the line of Anderson's survey, so far that a line north 46¼ east will include the quantity." Which entry was surveyed by Thomas M. Saunders, deputy surveyor, October 6, 1818, and returned to the principal surveyor's office and recorded November 25, 1818. This last entry and survey was patented to Pope and Saunders anterior to the date of the patent to Wallace.

It was a part of the agreed case that either party might introduce other competent testimony.

Under this latter clause the plaintiff introduced copies from the United States general land office of the original warrant to A.

Singleton, as attorney in fact to Holmer, deceased, bearing date March 9, 1784; of Singleton's entry and survey; of a power of attorney from Lucy H. Taylor and Richard Singleton, devisees of Anthony Singleton, deceased, to John D. Munford, constituting him their attorney and authorizing him to manage and dispose of their lands in Ohio, dated July 23, 1832; of a conveyance from Munford, as attorney as aforesaid, to Wallace of twenty-two hundred and fifty acres of land on the Singleton survey upon Lee's creek for the consideration of five hundred dollars, dated October 14, 1833; and a copy of an affidavit of Peyton Randolph, filed in the land office and bearing date September 11, 1822, by which is proved that at that time Lucy H. Taylor and Richard Singleton were the only heirs of Anthony Singleton, deceased; and also a copy of Anthony Singleton's will, dated July 6, 1795, and of the probate of the same.

If, when these agreed facts are in evidence, the law of the case is with the plaintiff, judgment is to be entered in his favor, otherwise judgment is to be entered for the defendant.

175] *J. SCOTT & SON, for plaintiff.

C. HAMMOND, for defendant.

Judge HITCHCOCK delivered the opinion of the court:

There is no controversy in this case but that the patent of the lessee of the plaintiff covers the same land that is covered by the patent under which the defendants claim, and as this latter patent is anterior in date, the legal title to the premises in controversy is in the defendants, unless their patent is void. That it is void is insisted by the plaintiff's counsel on the ground that it is in contravention of the proviso to section 1 of the act of Congress of March 2, 1807. By this it is provided that no locations shall after that date be made within the Virginia military district, "on tracts of lands for which entries have been previously surveyed," and it is declared that any patents issued contrary to these provisions "shall be considered null and void." Swan's L. L. 134.

The lands patented to Pope and Saunders had been surveyed for Singleton previous to any entry made by them; of course under this law their patent is void if Singleton's survey is within its meaning. It becomes necessary, therefore, to ascertain the

Lessee of Wallace *v.* Saunders.

object, intent, and meaning of this law. To those acquainted with the subject it is well known that before the passage of this act it was not unfrequently the case that entries were made upon lands which had been previously not only surveyed, but patented. These subsequent locations were sustained if there was any error or irregularity in those which had been previously made. That there should be errors and irregularities is not surprising, when we consider the state of the country when those locations and surveys were made. It was a wilderness far distant from the habitations of civilized man. But it was not without inhabitants. The western Indians claimed it as their own, and to protect their real or imaginary rights waged a war of extermination against those who attempted to interfere with those rights. In the times of these wars, and in constant fears of Indian warriors, were many, indeed, most of the early locations made. Under such circumstances it would seem to be next to impossible but that there should have been errors and mistakes. But when peace returned, when the country became better known, locations could be made with greater precision *and surveys executed with more ac- [176 curacy. Locators and surveyors, regardless of the claims of those who owned defective surveys, and who, relying upon the supposed strength of their title, had expended much both of labor and money in reducing the wilderness to a cultivated country, were constantly in the habit of making new entries upon these defective locations, and grasping to themselves the lands included therein, made more valuable by honest industry. The necessary consequence was almost perpetual litigation, and a want of confidence and great uncertainty in the titles. To remedy these evils, the proviso to the act of March 2, 1807, was introduced. It was intended to preserve "the peace and quiet of the inhabitants by securing titles previously acquired." It was intended to protect such surveys as were defective and "which might be avoided for irregularity." 1 Peters, 628. But it could not have been intended, as we apprehend, for the protection of such surveys as were absolutely void, or, in other words, such surveys as could not at any time after they were made be, consistently with law, carried into grants.

The land between the Scioto and Little Miami rivers was set apart to satisfy claims for military services, due to the officers and soldiers of the Virginia line on continental establishment, and

could not with propriety be appropriated to any other purpose, until those claims were satisfied; and no part of it was withdrawn from its liability to be surveyed for military warrants prior to the act of Congress of June 26, 1812. 9 Wheat. 469; 2 Peters, 417. By this act the line usually denominated Ludlow's line was provisionally established as the western boundary of the reserve (Swan's L. L. 137), and since that period no locations of military land thereafter located west of that line have been held valid.

If any of these lands have been surveyed for any other purpose than to satisfy military warrants granted by the State of Virginia for military services, in the Virginia line or continental establishment, such surveys would not be within the meaning of the act of March 3, 1807. In the case of Doddridge *v.* Thompson, 9 Wheat. 469, the entry under which the plaintiff claimed had been made subsequent to the passage of the act upon lands which had been long before surveyed under the direction of the surveyor-general of the United States; still the defendants were not protected by these surveys. The *same state of facts existed in the case of Reynolds *v.* McArthur, 2 Peters, 469, and the result was the same. It is true that in those cases this question does not appear to have been directly made, but had those previous surveys been within the law, it would have furnished a complete and adequate defense. In the case of Miller and others *v.* Kerr and others, 7 Wheat. 1, the Supreme Court of the United States decided that "where the register of the land office in Virginia had by mistake given a warrant for military services in the continental line, on a certificate authorizing a warrant for services in the state line, and in recording it pursued the certificate and not the warrant, the court could not support a prior entry and survey thus issued by mistake against a senior patent."

In the case of Lindley and other *v.* Lessee of Miller, 6 Peters, 666, the same court say, at page 675, in making the cession, Virginia only reserved the right of satisfying warrants " issued for military services in the state line, on the continental establishment. Warrants of no other description, therefore, could give any right to the holder to any land in this district." Again, at page 676, " to cure defects in entries and surveys, was the design of the act of 1807. It was intended to sanction irregularities, which had occurred without fraud, in the pursuit of a *valid title.* In the pas-

Lessee of Wallace *v.* Saunders.

sage of this act, Congress could have had no reference but to such titles as were embraced within the deed of cession." And again, at page 678, "there can be no doubt but that Congress did intend to protect surveys which had been irregularly made, and it is equally clear they did not design to sanction *void* surveys. A survey is void unless made under the authority of a warrant."

In the opinion of this court, a survey to be protected under the proviso to the act of March, 1807, must be such as has been made in good faith, under the authority of a warrant for military services in the Virginia line on continental establishment, and it must be, at the time of the subsequent location, a subsisting survey.

Is the survey, under which the plaintiff claims and in virtue of which he seeks to defeat the title of the defendants, of this description? It is not a little extraordinary that if this survey was legally made, "in pursuit of a valid title," no patent should have been issued for the period of thirty-nine years, especially when we take into consideration the fact that, *as early as 1822, [178 at least, there was evidence in the land office that the grantors of the plaintiff's lessor were the sole surviving heirs of Anthony Singleton. This evidence must have been filed for some purpose, and unless that purpose was to procure a patent, it is impossible to conjecture what it might have been. Still no patent is issued for twelve years thereafter. It is equally extraordinary that the lessor of the plaintiff, if he considered the survey a good and subsisting survey, should in the year 1834 have paid but the trifling sum of five hundred dollars for twenty-two hundred and fifty acres of land, on Lee's creek, in the county of Highland. But, although these circumstances may satisfy our minds that the survey was considered of doubtful validity, still they do not prove it to have been void.

The entry upon which the survey is based, was made in 1795, and purports to have been made by "Anthony Singleton, attorney in fact for Christian Holmer, *deceased*." It was surveyed for Anthony Singleton, "attorney in fact for Christian Holmer, deceased."

The question which here arises is, for whom was this survey made, or rather in whom was the title, so far as title is confirmed by survey? The services for which the warrant issued were performed by Christian Holmer, and he, his heirs or assigns, were,

according to the laws of Virginia, entitled to the bounty. But as an entry and survey made in his name or for his benefit, it could be of no effect. It was made by his attorney in fact, after his own death. It can not be doubted that as a general rule the authority of the attorney ceases upon the death of the principal. If, then, after the death of the principal, the attorney makes an entry, it is done without authority, and of course void. Further, in the case of Galt and others *v.* Galloway and others, 4 Peters, 345, the court say, " an entry made in the name of a dead man is void." And the same point was expressly decided in the case of McDonald's Heirs *v.* Smalley and others, 6 Peters, 261 ; as a survey, then, in the name of Holmer, or for his use and benefit, this survey is utterly void.

If this is considered as a survey in the name of Singleton, or for his use and benefit, then the question arises whether he had any right to make the entry. The warrant itself shows, the whole case shows, that he has performed no services to entitle himself to a bounty in lands under the laws of Virginia. 179] *The warrant, it is true, purports to be issued in consideration of services rendered in the Virginia line on continental establishment. But these services were performed by Holmer, not by Singleton. The law of Virginia authorizes a warrant to issue to the party performing the services, " his heirs or assigns." Swan's L. L. 112. Singleton claimed no right either as " *heir or assignee.*" He was merely attorney in fact. The warrant upon its face shows that it was issued to one having no right to receive it. In our opinion a survey made under such a warrant is not within the meaning of the act of 1807. It is not such a survey as will render void a patent based upon an entry subsequent to its date. It is in fact void, having been made for a person who had not the shadow of right to claim lands within the district.

What the effect would have been had a patent been issued upon this survey of an earlier date than the patent of the defendant, it is unnecessary to determine. As the case is now situated, we have no hesitation in saying that judgment must be entered for the defendants.