[Civil No. 791. Filed March 20, 1903.]

[71 Pac. 965.]

M. M. TRICKEY, Administrator of the Estate of Norman H. Chapin, Deceased, Defendant and Appellant, v. GEORGE W. CROWE, Plaintiff and Appellee.

1. BROKERS — OPTION CONTRACT — EXPIRATION — SUBSEQUENT SALE.— Where the owner of an interest in a mine agreed to give plaintiff a certain commission for selling same, and a prospective purchaser was secured, who took an option on the interest for a certain period, the owner depositing a deed in escrow, but the owner died before the expiration of the option, and the deed, on the failure of the purchaser to make payment, was returned to his administrator, who subsequently sold the interest to the same purchaser at the same price but on different terms, the administrator was not liable to plaintiff for the commission agreed on in the contract with decedent.

APPEAL from a judgment of the District Court of the First Judicial District in and for the County of Santa Cruz. George R. Davis, Judge. Reversed.

Judgment of supreme court affirmed. Opinion, 204 U. S. 228.

The facts are stated in the opinion.

Smith & Ives, and Duffy & Richardson, for Appellant.

In all cases where the principal has revoked the contract before the broker has earned his commissions, the broker's right to commissions is absolutely cut off, except where it has been found as a fact that such revocation was a mere device to defraud the broker of his right to commissions. *Sibbald* v. *Bethlehem Iron Co.*, 83 N. Y. 378, 38 Am. Rep. 441; *Beale* v. *Creswell*, 3 Md. 196; *Zeimer* v. *Antisel*, 75 Cal. 509, 17 Pac. 642; *Armstrong* v. *Wann*, 29 Minn. 126, 12 N. W. 345; *Satterthwaite* v. *Vreeland*, 46 How. Pr. 508; *Carlson* v. *Nathan*, 43 Ill. App. 364; *Buehler* v. *Wiffenbach*, 21 Misc. Rep. 30, 46 N. Y. Supp. 861; *Pryor* v. *Jolly*, 91 Tex. 86, 40 S. W. 959; *Antisdell* v. *Camfield*, 119 Mich. 229, 77 N. W. 944.

The interest arising from commissions is not such an interest as will render the authority irrevocable. *Stier* v. *Imperial Life Ins. Co.,* 58 Fed. 843; *Barr* v. *Schroeder,* 32 Cal. 609; *Chambers* v. *Seay,* 73 Ala. 372; *Hamilton* v. *Frothingham,* 59 Mich. 253, 26 N. W. 486; *Green* v. *Cole,* 103 Mo. 70, 15 S. W. 317; *Coffin* v. *Landis,* 46 Pa. St. 426.

The death of the principal put an end to the agency, the broker's authority not being coupled with an interest. *Boone* v. *Clarke,* 3 Cranch C. C. 389, Fed. Cas. No. 1641; *Hunt* v. *Rousmanier,* 8 Wheat. 174, 5 L. Ed. 589; *Missouri* v. *Walker,* 125 U. S. 339, 8 Sup. Ct. 929, 31 L. Ed. 769; *Scruggs* v. *Driver,* 31 Ala. 274.

Hereford & Hazzard, for Appellee.

DOAN, J.—This was an action brought by the appellee, as plaintiff, against the appellant, as administrator of the estate of N. H. Chapin, deceased, to recover the sum of five thousand dollars as commission on a sale alleged to have been effected by the plaintiff for the deceased, Chapin, during his life, of a one-fourth interest in a mine. The facts in the case, as disclosed by the record, were as follows: Previous to March, 1899, a mine known as the "Pride of the West" was owned by three parties. A man named Olsen owned one half thereof, and Norman H. Chapin and Jerry Neville each owned a one-fourth interest therein. In March, 1899, the plaintiff, Crowe, brought this mine to the attention of one Emerson Gee and his associate, A. R. Wilfley, and visited the mine with them. Wilfley subsequently, in the latter part of March, 1899, purchased Olsen's one-half interest, and made an agreement with Chapin and Neville for the purchase of the remaining one-half interest, a deed to which remaining one-half interest was executed by Chapin and Neville and placed in escrow, the terms of the escrow agreement providing that the deed was to be delivered to Wilfley upon the payment by him of the sum of one hundred thousand dollars in cash on or before the first day of April, 1900. It was verbally agreed between Crowe on the one part and Chapin on the other, representing himself and Neville, that Crowe was to receive ten per cent of the purchase money received by them for their interest in the mine as a commission for making the sale. This verbal agreement was made and the terms of sale were arranged in

the latter part of March, 1899, and on April 1, 1899, the deed and escrow agreement were executed by Chapin and Neville, and deposited in the Consolidated National Bank of Tucson. Prior to the first day of April, 1900, Chapin and Neville both died. M. M. Trickey was appointed the administrator of Chapin's estate, and one Henry Harmon was appointed the administrator of Jerry Neville's estate. Wilfley failed to pay the money and take the property under this option, and after the expiration of the time mentioned in the escrow agreement, and in accordance with the terms thereof, the deed in escrow was returned to Trickey, the administrator of Chapin's estate. Thereafter, on the seventh day of April, 1900, upon the payment of one thousand dollars by Wilfley, the administrators of these two estates made another agreement with him, by the terms of which they agreed to execute a deed to the half interest in the said mine owned by the two estates upon the payment of the purchase price of one hundred thousand dollars in specific amounts upon the different dates therein expressed. After the lapse of this option, M. M. Trickey, as administrator of the estate of Chapin, on the nineteenth day of June, 1900, entered into another agreement, whereby he gave to Wilfley an option to purchase the one-fourth interest in the said mine owned by the estate of Chapin, and obligated himself to execute to Wilfley a deed for such interest upon the payment of five thousand dollars in cash, five thousand dollars within three months, the further sum of five thousand dollars within six months, the further sum of five thousand dollars within nine months, the further sum of five thousand dollars within twelve months, and the further sum of twenty-five thousand dollars within eighteen months, making the full sum of fifty thousand dollars, the full purchase price to be paid. In pursuance of this option A. R. Wilfley was credited with five hundred dollars of the one thousand dollars paid on the lapsed option of April 7th prior, and paid to Trickey, administrator, four thousand five hundred dollars on that date, June 19, 1900, and afterwards five thousand dollars on September 19, 1900, five thousand dollars on December 19, 1900, five thousand dollars on March 20, 1901, five thousand dollars on June 17, 1901, and twenty-five thousand dollars on December 7, 1901, as the purchase price of the

interest of said estate in the said mine, being an undivided one-fourth interest therein.

On the tenth day of November, 1900, the plaintiff, Crowe, presented to Trickey, as the administrator of Chapin's estate, his claim against the estate of said Chapin for "ten per cent of the purchase price of the Pride of the West mine, agreement for the sale of which was entered into about April 1, 1899, and which said agreement of sale was made by Chapin and Neville to A. R. Wilfley, and which sale was brought about by the said George W. Crowe, upon the agreement that he was to receive ten per cent commission upon said purchase price from said Chapin and Neville, one half of said ten per cent being $5,000." This claim having been rejected by the administrator, George W. Crowe brought this action in the district court of Santa Cruz County on the twenty-fifth day of January, 1901. He alleged in his complaint that Norman H. Chapin died on or about the eleventh day of January, 1900, and that on the eighth day of February, 1900, the defendant, M. M. Trickey, was appointed and qualified as the administrator of Chapin's estate; that between the eighth day of February, 1898, and the eleventh day of January, 1900, the plaintiff performed services for the deceased, Chapin; that the particular nature of the said services was procuring a purchaser and bringing about the sale of the interest of said deceased, together with the interest of his co-owner, Jerry Neville, in the said mine, to such purchaser; that the purchaser so found and procured by plaintiff was A. R. Wilfley; that through the services and efforts of plaintiff the said deceased and the said Neville were enabled to sell and did sell to the said A. R. Wilfley their said interests in the said mine for the purchase price of one hundred thousand dollars, of which the share of the said deceased was fifty thousand dollars; that said services were reasonably worth the sum of five thousand dollars, and that said Chapin promised and agreed to pay to plaintiff for said services the sum of five thousand dollars, being ten per cent of said purchase price; that, as plaintiff believed, the whole of said purchase price had been paid to said Chapin or to said defendant, and that neither the said Chapin nor the said defendant had paid to plaintiff the said five thousand dollars, or any part thereof; that the claim therein set forth was,

about the tenth day of November, 1900, presented to the defendant, as administrator of Chapin's estate, and by him rejected; that the estate of Chapin was solvent.

The defendant answered by demurrer, an allegation of defect of parties, and a verified general denial.

On the trial of the case before the court without a jury, the court found as facts: "That between the 8th day of February, 1898, and the 11th day of January, 1900, the plaintiff performed services for the said Norman H. Chapin, at the request of said Chapin, in bringing about a sale of the interests of the said Chapin in the Pride of the West mine, which mine is located in the said county of Santa Cruz; that the particular nature of said services was the finding and procuring of a purchaser and bringing about a sale of the interests of the said Chapin in the said Pride of the West mine; that the purchaser so found and procured by plaintiff was A. R. Wilfley, of Denver, Colorado—for which services the said Chapin agreed to pay to the said plaintiff ten per cent of all moneys received by the said Chapin from the said Wilfley on account of the sale by the said Chapin and the purchase by the said Wilfley of the said mine. That the said A. R. Wilfley paid to the said defendant, as such administrator, for the interest of the said Chapin, the sum of fifty thousand dollars ($50,000), as follows: April 7, 1900, $500; June 19, 1900, $4,500; September 19, 1900, $5,000; December 19, 1900, $5,000; March 20, 1901, $5,000; June 17, 1901, $5,000; December 7, 1901, $25,000." Upon these facts the court rendered judgment in favor of the plaintiff for five thousand dollars, and directed the defendant to pay the said sum out of the estate of Chapin in the due course of the administration of the said estate; from which judgment and the denial of a motion for a new trial the defendant appealed.

The appellant has presented in his assignment of errors many questions that we find it unnecessary to investigate or determine. Among the undisputed facts presented by the record in this case are these: Crowe, in March, 1899, as a broker, found and presented to the owners of the mine as a purchaser A. R. Wilfley, who purchased a half interest in the mine from Olsen, and took from Chapin, who represented himself and Neville, an option on the other half interest owned by them. By the terms of this option Wilfley had

the privilege of paying one hundred thousand dollars on the first day of April, 1900, and taking the deed to the one-half interest in the mine, which was, in pursuance of the terms of said option agreement, executed by N. H. Chapin, Marie Chapin, Jerry Neville, and Refugia Neville, and was deposited in escrow to his order upon such payment. He failed to avail himself of this option, and after the expiration thereof, and after the death of both Chapin and Neville, the deed was returned to the administrator of Chapin's estate. Within seven days thereafter Wilfley entered into a written agreement, with M. M. Trickey, the administrator of Chapin's estate, and Henry Harmon, the administrator of Neville's estate, for the purchase of the property on the following terms: Ten thousand dollars cash, ten thousand dollars in three months, ten thousand dollars in six months, ten thousand dollars in nine months, ten thousand dollars in twelve months, and fifty thousand dollars in eighteen months, and paid one thousand dollars on such option. This was an independent transaction, in which no reference was made to the former option or deed deposited in pursuance thereof, but Trickey and Harmon, as administrators, agreed to execute deeds, and Wilfley and they acknowledged the instrument before a notary. Failing to pay the other nine thousand dollars of the cash payment, this option lapsed, and on June 19th Wilfley made another deal with M. M. Trickey, as the administrator of Chapin's estate, for the one-fourth interest owned by the Chapin estate, and paid four thousand five hundred dollars in cash on that date, and took from Trickey a bond obligating him, on the full payment of the remainder of the purchase price within the ensuing eighteen months, to execute a deed conveying to Wilfley the right, title, and interest of the estate of N. H. Chapin, deceased, in and to the said mining property, and described as a one-fourth interest therein. This was an independent transaction, containing no extension of, or reference to, any former agreement or deed, but Trickey bound himself upon the payment of the purchase price to execute a deed as administrator conveying the right, title, and interest of the estate. These payments were thereafter made on the times required in the title bond, and the sale perfected thereby. Crowe had nothing whatever to do with the sale of the property after the death of Chapin.

The only parties who participated in the negotiations leading up to the last contract executed by Trickey as administrator were Wilfley and Trickey. The only parties in the other instance—the contract of April 7, 1900—were Wilfley on the one side, and the administrators, Trickey and Harmon, on the other. Crowe bases his claim to commission entirely upon the agreement made with him by Chapin in March, 1899, and the subsequent purchase of the property by Wilfley from the administrator of Chapin's estate. Wilfley is the purchaser whom Crowe procured, and the same property contracted for between Chapin and Wilfley was subsequently purchased by Wilfley from the administrator of Chapin's estate at the same price agreed upon between Wilfley and Chapin, though on different terms, and in an entirely different transaction, after the option given by Chapin to Wilfley had expired. The whole question in this case is the liability of Chapin's estate to Crowe for the commission on such sale upon this state of facts.

The rule governing the liability for commission has been very plainly laid down in the decisions of our courts of last resort. These decisions in general terms hold that, in order to entitle him to commission, a broker must complete the sale of the property within the life of his contract, unless such completion is prevented through the fault of his principal, or his authority is revoked and his brokerage terminated in bad faith by his principal before the completion of such sale, for the purpose of preventing his receiving the commission that he has fairly earned. This general rule, in somewhat different language, is announced in the following citations:—

"The broker must complete the sale; that is, he must find a purchaser in a situation and ready and willing to complete the purchase on the terms agreed on, before he is entitled to his commissions." *McGavock* v. *Woodlief,* 20 How. 221, 15 L. Ed. 884.

"The duty assumed by the broker is to bring the minds of the buyer and seller to an agreement for a sale, and the price and terms on which it is to be made, and until this is done his right to commissions does not accrue. It must further appear that the broker performed the duty assumed by him within the time limited in his contract, or within such ex-

tension of time as may have been granted by his employer. If he fail to do that, he is not entitled to the commission, even though he made efforts to sell the property, and first called to it the attention of the party who subsequently made the purchase, unless the delay was caused by the negligence, fault, or fraud of the owner." *Zeimer* v. *Antisell,* 75 Cal. 509, 17 Pac. 642.

"Where the broker opens negotiations, but, failing to bring the customer to the specified terms, abandons them, and the owner subsequently sells the property to the same person at the price fixed, he is not liable to the broker for his commissions." *Wylie* v. *Marine National Bank,* 61 N. Y. 415.

"It is the established rule that a broker is never entitled to commissions for unsuccessful efforts. . . . The broker may devote his time and expend his money with ever so much devotion to the interests of his employer, and yet if he fails—if, without effecting an agreement or accomplishing a bargain, he abandons the effort, or his authority is fairly and in good faith terminated—he gains no right to commissions, and in such event it matters not that after his failure and the termination of his agency what he has done proves of use and benefit to the principal. He may have introduced to each other parties who otherwise would have never met. He may have created impressions which, under later and more favorable circumstances, naturally lead to, and materially assist in, the consummation of a sale. . . . But all that gives him no claim. This, however, must be taken with one important and necessary limitation. If the efforts of the broker are rendered a failure by the fault of the employer; if he changes his mind after the purchaser, ready and willing and consenting to the prescribed terms, is produced; or if the latter declines to complete the contract because of defect of title in or encumbrance on the property—then the broker does not lose his commission. One other principle applicable to such a contract needs to be kept in view : Where no time for the continuance of the contract is fixed by its terms, either party is at liberty to terminate it at will, subject only to the ordinary requirements of good faith. Usually the broker is entitled to a fair and reasonable opportunity to perform his obligation, but, that having been granted him, the right of the principal to terminate his authority is absolute and un-

restricted, except only that he may not do it in bad faith, and as a mere device to escape the payment of the broker's commission. . . . If, after the broker has been allowed a reasonable time within which to produce a buyer and effect a sale, he has failed to do so, and the seller in good faith and fairly has terminated the agency, and sought other assistance, by the aid of which a sale is consummated, it does not give the original broker a right to commissions because the purchaser is the one whom he introduced, and the final sale is aided or helped forward by his previous unsuccessful efforts." *Sibbald* v. *Bethlehem Iron Co.*, 83 N. Y. 378, 38 Am. Rep. 441.

The authority of a broker, and therefore his right to commissions on a sale made, may be terminated by the agreement of the parties, by revocation on the part of the principal, or by the operation of law. The citations above are from cases where the principal directly revoked the authority or withdrew the property from the broker. But the United States supreme court has said that "no principle is better settled than that the powers of an agent cease on the death of his principal." *Galt* v. *Galloway*, 4 Pet. 332, 7 L. Ed. 876. It is the general rule that the authority of an agent or broker, even when embodied in a power of attorney under such circumstances as to render it irrevocable during the life of the party granting it, becomes extinct by his death. This general rule that a power ceases with the life of the person giving it admits of but one exception: that, if the power be coupled with an interest, it survives the person giving it, and may be executed after his death. But by such interest is not meant an interest in that which is produced by the exercise of the power, but it must be an interest in the property on which the power is to operate. *Hunt* v. *Rousmanier*, 8 Wheat. 174, 5 L. Ed. 589. This exception to the rule will not affect the consideration of the case at bar, because the authority to sell on commission is not an authority coupled with an interest. The cases are uniform in this respect.

When we apply these principles to the facts of the present case, we find that the efforts of the broker, Crowe, resulted in procuring the purchaser, Wilfley, not to purchase absolutely, but to take an option on the purchase of this property, for one hundred thousand dollars. Crowe's principals executed a deed to the property and placed it in escrow. Although

Chapin and Neville both died before the expiration of that escrow agreement, the deed executed by them remained subject to the order of the purchaser, and, if he had availed himself of the terms of that agreement, the sale would have been completed, and the broker would have been entitled to his commission; but the failure of Wilfley to make the payment and take up the deed, and the return of the deed, after the expiration of the option and after Chapin's death, to the administrator of his estate, closed this transaction without any sale having been made, and therefore without any right to commissions having been acquired by Crowe. The sale that was subsequently effected was the result of the negotiations between Trickey, the administrator of Chapin's estate, and Wilfley. Crowe's power or authority to act in this manner had, before the date of his transaction, been terminated, and his agency revoked, by the death of Chapin, and he could have no further right or interest therein by virtue of the agreement of March, 1899, between him and Chapin.

There is no claim on his part that he was consulted by either the vendor or vendee in the later negotiations. He rendered no service to Trickey, received no appointment or agreement from Trickey in reference to the matter, and the fact that his former efforts to effect the sale, while he failed in its completion, might have tended to assist Trickey in perfecting it, or might have to a very great extent rendered possible the consummation of such sale, will not suffice to establish a claim on his part against the estate of Chapin for commission on a sale that Trickey accomplished without his service.

The court erred in finding that Crowe, "between the 8th day of February, 1898, and the 11th day of January, 1900, brought about a sale of Chapin's interest in the mine," the undisputed evidence in the case being that this sale was never perfected, but that after the expiration of the option the deed executed by Chapin was returned to the administrator of his estate, and the property was thereafter purchased by Wilfley through the medium of an independent transaction with the administrator, in which negotiations Crowe took no part, rendered no service, and had no interest.

The court likewise erred in finding: "That the said A. R. Wilfley paid to the said defendant, as such administrator,

for the interest of the said Chapin, the sum of fifty thousand dollars ($50,000), as follows: April 7, 1900, $500; June 19, 1900, $4,500; September 19, 1900, $5,000; December 19, 1900, $5,000; March 20, 1901, $5,000; June 17, 1901, $5,000; December 7, 1901, $25,000''—because there is no evidence to sustain such finding, but the undisputed evidence in the record proves the contrary. If Wilfley had paid the purchase price under the option given by Chapin, and had taken up the deed deposited by Chapin and Neville, the evidence thereof would have sustained this finding; but the plaintiff himself put in evidence the testimony of Wilfley and the purchase agreement made between Wilfley and the administrators, Trickey and Harmon, on April 7, 1900, and also the contract of sale and title bond executed by Trickey, as administrator, on June 19, 1900; none of which evidence is contradicted, and all of which established conclusively the fact that Wilfley paid the fifty thousand dollars mentioned in the finding on the dates as given therein to the defendant, Trickey, not for the interest of the said Chapin, as would have been the case had Wilfley paid it for the Chapin and Neville deed, but for the ''right, title, and interest of the said estate of Norman H. Chapin, deceased, in and to'' the said property, and in compliance with the terms of the contract of sale and title bond executed to him by Trickey, the administrator of said estate, on June 19, 1900.

The judgment of the lower court is reversed, the case is remanded, and judgment is directed to be entered in the lower court for the defendant.

Kent, C. J., and Sloan, J., concur.