FUSSELL *v.* HUGHES and another.[*]

SAME *v.* GREGG.

(*Circuit Court, N. D. Ohio, W. D.*   August, 1881.)

1. VIRGINIA MILITARY DISTRICT IN OHIO—ACT OF CONGRESS OF MARCH 23, 1804 —CONSTRUCTION OF—WHEN ENTRIES, SURVEYS, AND RETURNS REQUIRED TO BE MADE.

   By the act of congress of March 23, 1804, entitled "An act to ascertain the boundary of the lands reserved by the state of Virginia," etc., in Ohio, for the satisfaction of her officers and soldiers, and to limit the period for locating the same, a completed location within three years, and a survey and return thereof, with the original or certified copy of the warrant on which they were founded, to the general land-office, within five years from the passage of the act, were made conditions precedent, without compliance with which no one entitled to bounty land in that district could obtain a patent; and by section 3 of that act all lands in the reserved territory not thus effectually appropriated within these prescribed times should thenceforth cease to constitute a part of the reserved territory of the Virginia military district, should be *released from all claims for* such bounty lands by virtue of any location or survey not then completed and returned, and should become thereby the property of the United States, to be disposed of as part of its public lands, free from any trust in favor of the soldiers of Virginia.

2. SAME—SAME—SUBSEQUENT STATUTES—EXTENDING TIME OF ENTRY, ETC.—ACT OF 1804 REVIVED AND CONTINUED.

   The subsequent statutes extending the period of time for making valid entries, surveys, and returns of surveys, so as to entitle the party to a patent, although the third section of the act of March 23, 1804, was not repeated therein, are to be taken as reviving the entire law, including the third section, as if the latter had been incorporated with each new enactment, so that the consequences of a failure to take the steps required to procure a patent within the periods from time to time limited, prescribed in the third section, follow and apply to each successive extension of the time of grace.

3. SAME.

   All entries *and surveys* made prior to January 1, 1852, and of which no return, with the original warrant or a certified copy thereof, had then been made to the general land office, are vacated and made void, so that they cannot lawfully serve as the basis of patents; the land covered by them lapsing into the general body of the public lands and no longer constituting any portion of the Virginia military reservation of bounty lands.

*Reported by J. C. Harper, Esq., of the Cincinnati, bar.

4. SAME—ENTRY AND SURVEY GAVE CONDITIONAL, NOT ABSOLUTE, ESTATE.

The entry and survey did not vest the party with an equitable estate which congress cannot deprive him of by legislation. His rights were not vested *absolutely*, but only subject to the conditions prescribed by the statutes, under which alone his rights arose; and, having failed to comply with the conditions prescribed to perfect his estate and title, his inchoate rights never ripened into an indefeasible title.

5. EQUITY—RECOVERY OF POSSESSION OF LAND BY EQUITABLE OWNER—LEGAL TITLE IN UNITED STATES.

A bill for the recovery of possession of land, but asserting no equity against the defendants in possession except that they are in possession without title to the land which in equity belongs to complainant, the legal title to which is in the United States, cannot be entertained.

6. JURISDICTION OF UNITED STATES COURTS OVER SURVEYOR—VIRGINIA MILITARY DISTRICT.

The United States courts have no jurisdiction over the principal surveyor of the Virginia military district in the discharge of his duties, and have no right to control the public records lawfully in his custody.

*Galt* v. *Galloway,* 4 Pet. 332, *followed.*

7. EQUITY—STATUTE OF LIMITATIONS—LEGAL AND EQUITABLE TITLES.

In equity, as well as at law, a statute of limitations is a bar when the conflicting titles are adverse in their origin, and one was equitable and the other legal.

8. STATUTE OF LIMITATIONS—ADVERSE POSSESSION—ENTIRE TRACT CLAIMED.

One who enters upon land under color of title, intending to take possession of the entire tract, no part of which is held adversely at the time of his entry, is deemed to be in possession to the extent of his claim.

9. OHIO STATUTE OF LIMITATIONS—REAL ACTIONS—WHEN TO BE BROUGHT AFTER REMOVAL OF DISABILITY.

Under sections 4977–8 of the Revised Statutes of Ohio, limiting the times within which actions for the recovery of the title or possession of real estate may be brought, the action must be brought within 10 years after the disability is removed, unless in cases where that period would terminate less than 21 years from the time the cause of action accrued.

In Equity.

*Jeremiah Hall,* for complainant.

*West, Walker & West,* for defendants.

MATTHEWS, Justice. These suits were argued and may be decided together. The material facts as they appear by the pleadings and proofs, so far as material at present, are as follows:

On the nineteenth day of July, 1822, warrant No. 6508, for 200 acres of land, was granted by Virginia to Archibald Gordon, late of Cecil county, Maryland, for service in the Virginia line, on continental establishment, in the war of the revolution.

On July 1, 1823, he caused this warrant to be located on entry 12017, in the Virginia military district, in Logan county, Ohio, and the same to be duly recorded.

On March 25, 1823, this location was carried into survey, and on November

5, 1824, this survey was recorded in the office of the principal surveyor of said district at Chillicothe.

Archibald Gordon died intestate about the year 1829 or 1830, leaving Archibald Gordon, Jr., his only child and heir at law.

Archibald Gordon, Jr., died intestate about the year 1833 or 1834, leaving the complainant and her sister, Sarah Priscilla, his only children and heirs at law.

The complainant was intermarried on November 1, 1855, and her husband died about August 1, 1865. Her sister, Sarah P., was married about December 4, 1848, and died leaving Sarah Elizabeth her only child and heir at law; her husband died about the year 1855. Her child, Sarah Elizabeth, died at the age of nine years and six months, leaving complainant her sole heir at law.

No patent has ever been applied for or issued, on this entry and survey, by or to Archibald Gordon or his legal representatives. According to the testimony of E. P. Kendrick, principal surveyor of the Virginia military district at Chillicothe since 1845, this entry and survey of Archibald Gordon are marked "withdrawn" on the record, as he supposes, because it was thought that the location was made upon a state-line warrant, though he never saw the warrant. His supposition is based on a note made on the record of Gordon's location of the words "state line;" but by whom this note and the word "withdrawn" were written, and at what time, he does not know. A certified copy or duplicate of warrant No. 6508, the original being dated July 19, 1822, to Archibald Gordon, certified by the register of the Virginia land-office at Richmond, Virginia, shows that it was issued in consideration of services as a private in the continental line.

On May 25, 1840, Cadwallader Wallace made an entry in his own name of 50 acres of land in said district, and caused the same to be recorded on military warrant No. 6713, described so that the *west* line of the Gordon survey No. 12017 should be the east line of Wallace's entry No. 14530.

On the next day, May 26, 1840, Wallace caused a survey of this entry to be recorded, and from the survey it appears that his 50 acres were laid off and described, so that the whole of it lies within the limits of the Gordon survey; the west line of the latter being also the west line of the Wallace survey, instead of the east line, as called for by the entry. And on April 8, 1842, Wallace obtained a patent from the United States for the land described by and embraced within this survey.

On October 4, 1851, Daniel Gregg made an entry in the records of the principal surveyor of said district, No. 16070, of 130 acres, on military warrant No. 442, to include the vacant lands between surveys 9993, 9997, 9994, 9958, and 14530, the last-named being Wallace's 50-acre survey, as above described.

On December 20, 1851, Gregg procured 100 acres of his entry to be surveyed so as to cover that much of the land within the entry and survey No. 12017, of Archibald Gordon, lying next east to Wallace's 50-acre survey.

Cadwallader Wallace, by a previous entry and survey, recorded November 5, 1834, became the proprietor of 150 acres of land, the title to which is not in dispute, described in the survey so that its *east* line coincided its full length for that distance with the *west* line of Archibald Gordon's survey No. 12017 to

its north-west corner; Gordon's west line, for 240 poles from a stake to the north-west corner of his survey, being one of the calls in this survey of Wallace.

Of the 50 acres described in Wallace's survey No. 14530, 21 acres off the northern part are claimed by the defendant Hughes, and 29 acres remaining by the defendant Esther Dennison, who are joined in the first bill, who derive title from Wallace and are in possession. The 100 acres patented to Gregg, and conveyed by him to Swisgood and others, are covered by the second bill, to which they are made defendants. Kendrick, the principal surveyor of the military district, is made a defendant to both bills.

The complainant claims that she is, by virtue of the entry and survey of her ancestor, Archibald Gordon, now seized in fee-simple of an equitable estate in the land embraced therein, and entitled to the immediate possession thereof; that the entry and survey of Cadwallader Wallace, No. 14530, and his patent issued thereon, and the entry of said Gregg, and his survey and patent, were all of them made and obtained in violation of the proviso of the second section of the act entitled "An act to extend the time for locating Virginia military land-warrants and returning surveys thereon to the general land-office," approved March 1, 1823, and are all of them void.

The relief prayed for is that the location, entry, and survey No. 12017, in the name of her ancestor, Archibald Gordon, founded on said military warrant No. 6508, be established and affirmed, and the validity thereof forever perpetuated; that the location of said Cadwallader Wallace, his entry, survey No. 14530, and patent, and the location of Daniel Gregg, his entry, and survey No. 16070, and patent, be adjudged to have been made and issued in violation of the proviso of said act of congress and void; that the words "withdrawn" and "state line," so written upon said records, location, entry, and survey No. 12017, be adjudged to have been so written without authority, and that the evidence of said military warrant No. 6508, and original survey of said entry No. 12017, be forever perpetuated; that the complainant may have an order for the delivery of the possession of said premises to her, for an account of rents and profits, and for general relief.

The act of March 1, 1823, referred to in the pleadings, after providing, in the first section, that the officers and soldiers of the Virginia line on continental establishment, their heirs and assigns, who are entitled to bounty lands within the country reserved by the state of Virginia between the Little Miami and Scioto rivers, shall be allowed a further time of two years from the fourth day of January, 1823, to obtain warrants and complete their locations, and the further time of four years from the same period to return their surveys and warrants to the general land-office to obtain patents, contains in the second section a proviso in the following words:

" Provided, that no locations as aforesaid, in virtue of this or the preceding section of this act, shall be made on tracts of land for which patents had

previously been issued; or which had been previously surveyed; and any patent which may, nevertheless, be obtained for land located contrary to the provisions of this act shall be null and void." 3 St. at Large, 772.

The right of the complainant to the relief sought is contested on several grounds, which remain to be stated and considered in their order:

1. The defendants, in the first place, deny the heirship of the complainant, and claim that at least there is a failure of proof upon that point. Without critically examining and analyzing the evidence upon the question, it is sufficient to say that there seems to be enough competent testimony in support of the complainant's claim to justify a finding in her favor.

2. The next ground of objection is more serious, and difficult of satisfactory determination. It appears from the testimony that Archibald Gordon, Jr., son of the revolutionary soldier, was married in 1827 to Sarah E. Hart, daughter of Joseph Hart and sister of Stephen F. Hart. There is also produced in evidence, on the part of the defendants, a copy, certified by the recorder of Logan county, in which these lands are situate, of a deed duly executed, and dated June 27, 1827, between Archibald Gordon, described therein as late of Cecil county, Maryland, and Stephen F. Hart, of the county of Baltimore, whereby, in consideration of $100 paid by Joseph Hart, Archibald Gordon grants, bargains, and sells to Stephen F. Hart, in fee-simple, all his lands in Ohio, Indiana, and Illinois, describing, amongst others, one tract in Ohio, surveyed on military warrant No. 6508 and on entry No. 12017, and setting out an accurate copy of the description contained in the survey. This deeds purports to have been signed and sealed by Archibald Gordon, and is acknowledged by him in the city of Baltimore, before two justices of the peace, duly certified to have been such at the time by the clerk of the superior court of that city.

It is contended by the defendants that it is effectually shown by this deed that no estate or interest in the lands in controversy ever vested in the complainant, whether it be regarded as the deed of Archibald Gordon, Sr., or of his son; even on the latter supposition, if it were made during the life-time of his father. That Archibald Gordon, Sr., was living at the time of its date is clearly shown by proof that he was in receipt of a pension as late as in September of the year 1829. In the absence of any proof on the subject, and if it were necessary to the decision of the case, it seems to me that the

presumption naturally arising upon the circumstances of the case require that it should be held to be the deed of Archibald Gordon, Sr. On the supposition that it was the deed of his son, and made in the life-time of the father, the same presumption would justify a finding in its support of a previous conveyance from the father to the son. And the recital contained in it that the lands conveyed are "*his* lands," even in the absence of a covenant of general warranty, would seem to be sufficient to prevent by estoppel the complainant, as the grantor's heir at law, deriving title through him, from now claiming an estate in derogation of that deed. But the contrary was held by the supreme court of Ohio in the case of *Hart* v. *Gregg*, 32 Ohio St. 502, which was a suit brought by the heirs of Hart, the grantee in this very deed, against some of the present defendants, for the purpose of recovering a part of the lands in controversy in this suit. It would be anomalous if the defendants in that suit, having succeeded in protecting themselves against the claim of Hart's heirs, on the ground that the deed to their ancestor passed no title, should now be permitted to defend themselves against Gordon's heirs on the ground that it passed all her ancestor's title to Hart. In the view I feel compelled to take of the rights of the parties upon other grounds, the determination of the question as to the effect of this deed becomes immaterial.

3. It is evident that the foundation of the complainant's case is in the proposition plainly affirmed in the bills that she is now seized in fee-simple of the equitable estate in said location of land, and entitled to the immediate possession. This proposition is negatived by the defendants, and this is the main contention of the parties. To decide it requires a review of the legislation on the subject, as the question turns on the meaning and application of the acts of congress which relate to it. On March 23, 1804, congress passed an act entitled "An act to ascertain the boundary of the lands reserved by the state of Virginia, north-west of the river Ohio, for the satisfaction of her officers and soldiers on continental establishment, and to limit the period for locating the said lands." The second section provides—

"That the officers and soldiers, or their legal representatives, who are entitled to bounty lands within the above-mentioned reserved territory, shall complete their locations within three years after the passing of this act; and every such officer and soldier, or his legal representatives, whose bounty land has or shall have been located within that part of the said territory to which the Indian title has been extinguished, shall make return of his or their surveys to the secretary of the department of war, within five years after the passing of this act, and shall also exhibit and file with the said secretary, and within the same

time, the original warrant or warrants under which he claims, or a certified copy thereof, under the seal of the office where the said warrants are legally kept, which warrant or certified copy thereof shall be sufficient evidence that the grantee therein named, or the person under whom such grantee claims, was originally entitled to such bounty land; and every person entitled to said lands, and *thus applying*, shall thereupon be entitled to receive a patent in the manner prescribed by law."

The third section is as follows:

"That such part of the above-mentioned reserved territory as shall not have been located, and those tracts of land within that part of the said territory to which the Indian title has been extinguished, the surveys whereof shall not have been returned to the secretary of war within the time and times prescribed by this act, shall thenceforth be released from any claim or claims for such bounty lands, and shall be disposed of in conformity with the provisions of the act entitled 'An act in addition to and modification of the provisions contained in the act entitled An act to enable the people of the eastern division of the territory north-west of the river Ohio to form a constitution and state government, and for the admission of such state into the Union on an equal footing with the original states, and for other purposes.'"

It will be observed that the effect of this act was to declare that a completed location within three years, and a survey and return thereof with the original or certified copy of the warrant on which they were founded, to the general land-office, within five years from the passage of the act, were made by it conditions precedent, without compliance with which no one entitled to bounty land in this district could obtain a patent; and that by a distinct, substantive, and positive provision of the same act all lands in the reserved territory not thus effectually appropriated within these prescribed times should thenceforth cease to constitute a part of the reserved territory of the Virginia military land district, should be released from all claims for such bounty lands by virtue of any location or survey not thus completed and returned, and should become thereby the property of the United States, to be disposed of as part of its public lands, free from any trust in favor of the soldiers of Virginia on the continental establishment, to be otherwise disposed of in accordance with the statute referred to.

This construction and effect were given to this legislation by the supreme court in the case of *Jackson* v. *Clark*, 1 Peters, 628, in which, on that account, counsel denied the power of congress to enact it. In vindicating the limitation as a lawful exercise of power on the part of congress, Chief Justice Marshall pointed out that the reservation by Virginia in her act of cession was not a reservation of the whole tract of country between the rivers Scioto and Little Miami for the

exclusive benefit of her soldiers who served in the continental establishment, but of only so much of it as might be necessary to make good any deficiency that might exist of good lands set apart for them on the south-east side of the Ohio river. The residue of the lands were ceded to the United States for the benefit of the said states—

"To be considered as a common fund for the use and benefit of such of the United States as have become or shall become members of the confederation or federal alliance of the said states, Virginia inclusive, according to their usual respective proportions in the general charge and expenditure, and shall be faithfully and *bona fide* disposed of for that purpose, and for no other use or purpose whatever."

The chief justice then adds:

"Although, then, the military rights constituted the primary claim on the trust, that claim was, according to the intention of the parties, so to be satisfied as still to keep in view that other object, which was also of vital interest. This was to be effected only by prescribing the time within which the lands to be appropriated by these claimants should be separated from the general mass, so as to enable the government to apply the residue, which it was then supposed would be considerable, to the other purposes of the trust. The time ought certainly to be liberal; but unless some time might be prescribed the other purposes of the trust would be totally defeated, and the surplus land remain a wilderness."

Indeed, it is upon the basis of this right in congress and its effect that the chief justice, in that case, establishes the right in congress to make the provision in respect to new locations, the violation of which it is claimed by the complainant in this case, on the part of Wallace and Gregg, renders void their patents. In commenting on that provision, as contained in the act of March 2, 1807, in which it first appeared, and from which it was taken in the several successive acts in which it is found, the chief justice said:

"If the right existed to prescribe a time within which military warrants should be located, the right to annex conditions to its extension follows as a necessary consequence. The condition annexed by congress has been calculated for the sole purpose of preserving the peace and quiet of the inhabitants by securing titles previously acquired."

The act of 1804 was followed by that of March 2, 1807, which provided that the officers and soldiers of the Virginia line on continental establishment, entitled to bounty lands, etc., "shall be allowed a further time of three years from the twenty-third of March next to complete their locations, and a further time of five years from the said twenty-third of March next to return their surveys and warrants, or certified copies of warrants, to the office of secretary of the war department."

It also contains this proviso:

"Provided, that no locations as aforesaid within the above-mentioned tract shall, after the passing of this act, be made on tracts of land for which patents had previously been issued, or which had previously been surveyed; and any patent which may, nevertheless, be obtained for land located contrary to the provisions of this section, shall be considered null and void."

Successive acts were passed from time to time extending the time for making locations, and making and returning surveys,—April 11, 1818, (3 St. at Large, 423;) February 9, 1821, (3 St. at Large, 612;) March 1, 1823, (3 St. at Large, 772;) May 20, 1826, (4 St. at Large, 189,)—each of which retains and repeats the proviso first contained in the act of March 2, 1807. The act of May 20, 1826, extended the time for making locations to June 1, 1829, for making surveys to June 1, 1832, and for returning surveys to June 1, 1833. After these times thus limited had expired, there was no existing authority for making locations, surveys, and returns for five years, when the act of July 7, 1838, was passed, which renewed the authority until August 10, 1840, and provided in respect to the past that—

"All entries and surveys which may have heretofore been made within the said reservation, in satisfaction of any such warrants on lands not previously entered or surveyed, or on lands not prohibited from entry and survey, shall be held good and valid; *any omission heretofore to extend the time for the making of locations and surveys to the contrary notwithstanding.*"

This act of July 7, 1838, was revived and continued in force by the act of August 19, 1841, (5 St. at Large, 449,) until January 1, 1844; by the act of 1846, (9 St. at Large, 41,) until January 1, 1848; by the act of July 5, 1848, (9 St. at Large, 245,) until January 1, 1850; by the act of February 20, 1850, (9 St. at Large, 420,) until January 1, 1852. This is all the legislation on the subject except two subsequent statutes, which remain now to be noted. The first of these is an act passed March 3, 1855, (10 St. at Large, 701,) entitled "An act allowing the further time of two years to those holding lands *by entries* in Virginia military district of Ohio, which were made prior to the first of January, 1852, to have the same surveyed and patented." It provides that bounty lands which have been entered within the tract reserved by Virginia between the Little Miami and Scioto rivers, for satisfying the legal bounties to her officers and soldiers upon continental establishment, shall be allowed the further time of two years from and after the passage of the act to *make and return their surveys* and warrants, or certified copies of warrants, to the general land-office. The second is the act of May 27, 1880, the second section of which enacts that "all legal surveys returned to the land-office on or

before March 3, 1857, or entries made *on or before January 1, 1852,* and founded on unsatisfied Virginia military continenal warrants, are hereby declared valid."

The third section of the act of March 23, 1804,—the first of this series of statutes,—was not repeated in any subsequent law, but it was not repealed or modified; and although it verbally refers to the limitations of that particular act as making the release therein declared, it is not to be considered as having become inoperative by the expiration of the times limited in the act.    On the contrary, all the subsequent statutes extending the period of time for making valid entries, surveys, and returns of surveys, so as to entitle the party to a patent, are to be taken as reviving the entire law, including the third section, as if the latter had been incorporated with each new enactment; for the whole series is necessarily connected by the identity of its subject-matter, and must be taken and construed as though there was but one statute, so that the consequences of a failure to take the steps required to procure a patent within the periods from time to time limited, prescribed in the third section of the act of 1804, must be understood as following and applying to each successive extension of the time of grace.

This conclusion is strengthened by the language used in the act of July, 1838, confirming entries and surveys made in the interim between June 1, 1832, and the passage of that act, during which, as has been shown, the limitation which barred them had become complete.    That language is that such entries and surveys "shall be held good and valid, any omission heretofore to extend the time for the making of such entries and surveys to the contrary notwithstanding." Such language would not have been thought necessary, except upon the theory that, without it, all such entries and surveys would have been void.    So, too, it is manifest by the act of March 3, 1855, and of May 27, 1880, which extends the time for making and returning surveys until March 3, 1857, but on entries only that had been made prior to January 1, 1852, that since the last-mentioned date all entries and surveys made prior thereto are vacated, annulled, and made void, so that they cannot lawfully serve as the basis of patents; the land covered by them lapsing into the general body of public lands of the United States, to be disposed of according to the laws in force in respect thereto, and no longer constituting any portion of the Virginia military reservation of bounty lands.

That conclusion, adopted and applied to the present case, is fatal to the complainant's claim, as it takes away from her all foundation

for the equity which she asserts. The Gordon entry, No. 12017, was located and surveyed previous to January 1, 1852, and no return thereof with the warrant, or any certified copy thereof, has ever been made to the general land-office. It has therefore lapsed, and no longer subsists. This conclusion cannot be resisted on the ground that by the entry and survey, when originally made, Archibald Gordon became vested with an equitable estate, which congress cannot deprive him of by legislation, for the obvious reason that Gordon's rights were not vested *absolutely*, but only subject to the conditions prescribed by the statutes under which alone his rights arose; and, having failed to comply with and perform the conditions prescribed as essential to perfect his estate and title, his inchoate rights have never ripened into an indefeasible title. Neither is there any equity raised by the complainant on the ground of any alleged fraud by which she or her ancestor was prevented from taking the necessary steps to complete their title by obtaining a patent, and so protecting their interests forever, on the supposition that there was fraud and collusion between Kendrick and Wallace and Gregg, by which Kendrick was induced to write the word "withdrawn" upon the record of the Gordon entry and survey. There is no ground on which that fraud can be imputed to the defendants in possession, who appear to have been innocent purchasers of the title of Wallace and Gregg, without notice of any such claim. Even if it should be held that the patents of Wallace and Gregg were void, in contravention of the proviso to the act of March, 1823, annulling patents granted for lands which had been previously surveyed for another, still it could not better the position of the complainant by investing her with a legal title held by the United States for its own use, or reinstating an equity which had lapsed by operation of positive law, or estopping the defendants from insisting that she is not entitled to recover from them their possession without proof of a paramount title. As to the good faith and innocence of wrong on the part of the defendants in possession, it may be noticed that the counsel for the complainant, in his written argument, states that Wallace's ingenuity in covering up the location of Gordon, and in his deed, in the sale of it, ostensibly professing to locate and sell land west of Gordon's land, and Gregg engrafting his survey upon Wallace's, made it so that no one could, by an examination of the record, determine that either it or Wallace's survey covered Gordon's land. This exonerates the defendants in possession from any charge of fraud and collusion, but does not excuse the laches of the complainant, because no such confusion

could have the effect of misleading her as to her right, if she had any, to obtain a patent upon her grandfather's entry and survey, more especially as her counsel also insist that Kendrick could not have written the word "withdrawn" on the record of that survey until "long since 1850." As her right to apply for a patent expired by statutory limitation on January 1, 1852, it does not appear that she was prevented from an earlier application by the conduct of which she complained.

4. There is another and equally insuperable objection to the bills in these cases which prevents any decree in favor of the complainant for the relief prayed for, even on the theory and statements of the bills themselves. The complainant claims only an equitable estate, and yet prays for the recovery of possession of the lands against defendants in possession, as to whom she alleges they have no title either at law or in equity. She does not admit that the patents under which they claim have vested them with the legal title, but under such circumstances as to entitle her in equity to call for a conveyance and release. If she did, it would be an ordinary case for the exercise of jurisdiction by a court of chancery. But she asserts no equity against the defendants in possession except that they are in possession, without title, of land which in equity belongs to her, the legal title to which is in the United States. Under such circumstances her only remedy is, if she is entitled to do so, to clothe her equity with the legal title by an application under the law to the public officers of the United States charged with the duty of issuing patents to those entitled, and then proceed at law to recover possession. But she does not expect or ask for a decree of this court clothing her with the legal title, nor pray for a conveyance from the defendants of what they claim to have. It would be useless to declare the Wallace and Gregg patents void, because that would be no ground for further relief to the complainant; and if they are void they do not prevent the assertion of any legal rights she may have. And this court has no jurisdiction over the principal surveyor, Kendrick, in the discharge of his official duties, and no right to control the public records lawfully in his custody, and for whose contents he is officially responsible. On the whole, the case fails on its face for want of equity, and is clearly within the authority of the case of *Galt* v. *Galloway*, 4 Pet. 332.

5. But there is another substantial and satisfactory ground, concurring with those already discussed, on which the bills must be dismissed. If the complainant ever had the right of action now asserted, it is barred by lapse of time.

In *Miller* v. *McIntyre*, 6 Peters, 61, it was decided, following *Elmendorf* v. *Taylor*, 10 Wheat. 168, that in equity as well as at law a statute of limitations is a bar when the conflicting titles are adverse in their origin, and one was equitable and the other legal. Mr. Justice McLean, concluding his opinion, and speaking for the court, said:

"From the above authorities it appears the rule is well settled, both in England and this country, that effect will be given to the statute of limitations in equity, the same as at law. And as, in this case, there could be no doubt, if the complainant's ancestor had held by grant at the time the adverse possession was taken, that the statute would have barred the right of entry, the same effect must be given to it in equity"

In the present case, certainly, the complainant cannot ask to be placed in any better position than she would have been in if, at the time possession was taken under the Wallace and Gregg patents, she had received, as heir at law of Archibald Gordon, a patent for the land covered by his entry and survey. On that supposition what would have been her rights at the time she began the present suits? Wallace obtained his patent for 50 acres, on survey No. 14530, on April 8, 1842, being at that time the owner by patent of 150 acres adjoining on the west. In 1844 he conveyed by one deed the whole of both tracts, but as an entirety, to Sutton, who entered into possession soon after, which possession in him and his successors by deed I find to have been continuous, uninterrupted, open, notorious, and adverse from that time. The Gregg patent was issued November 20, 1855, and possession taken under it in 1856.

It is admitted by counsel for complainant that, as to 21 acres at the north end of the Gordon survey, there has been an adverse occupancy under the Wallace title for more than 30 years; but the adverse possession for more than 12 or 15 years is denied as to the residue, being the 29 acres at the south end of survey No. 14530. This denial rests upon the ground that the deed, under which Esther Dennison, and those under whom she claimed, claims to have title, embraced other lands in survey No. 13593, not in dispute, and on which the actual improvement took place; that now in controversy being left in woods, uncleared and unimproved. But this distinction cannot be supported. In *Clark* v. *Potter*, 32 Ohio St. 49, it was decided that "one who enters upon land under color of title intending to take possession of the entire tract, no part of which is held adversely at the time of his entry, is deemed to be in possession to the extent of his claim." These bills were filed November 2, 1879. The cause of action, as to the land

covered by the Gregg patent, accrued, as we find from the evidence, when possession was taken in 1856. It would have been barred in 1877 if complainant was under no disability. By the terms of the Ohio statute of limitations "an action for the recovery of the title or possession of lands, tenements, or hereditaments can only be brought within 21 years after the cause of action shall have accrued." Rev. St. § 4977.

" If a person entitled to commence such action is, at the time his right or title first descends or accrues, within the age of 21 years, a married woman, insane, or imprisoned, such person may, after the expiration of 21 years from the time his right or title first descended or accrued, bring such action within 10 years after such disability is removed, and at no time thereafter." Section 4978.

It will be perceived, from a careful reading of these provisions of the law, that the action must be brought within 10 years after the disability is removed, unless in cases where that period would terminate less than 21 years from the time the cause of action accrued. The party is entitled to 21 years at least, and as much more in case of being under disability when the statute would otherwise begin to run, as would be necessary to make 10 years from the removal of the disability.

In these cases the complainant was a married woman in 1856, when her cause of action accrued, if at all, as against those claiming under the Gregg patent. This disability was removed in 1865. Ten years after the removal of her disability, expired in 1875. Twenty-one years after the causes of action accrued, expired in 1877. The suit was not brought within either period, and is therefore barred.

As to the defendants under the Wallace patent, when they took possession in 1844 the complainant was 15½ years old and her sister 11. The disability was removed and the bar complete long before the institution of these suits.

On these several grounds the bills must be dismissed for want of equity.

The questions raised in respect to the defendants' title are immaterial, and have not been noticed; for, unless the complainant is entitled to relief on the ground of some equity of her own, the want of title on the part of the defendants will not supply it. They have a right to rest on their possession alone until some superior claim is established.